IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

```
UNITED STATES OF AMERICA,       )
                                )
              Plaintiff,        )       4:06CR 3172
                                )
       v.                       )
                                )
                                )
PAUL A. WENTWORTH,              )       REPORT, RECOMMENDATION,
                                )            and ORDER
              Defendant.        )
```

   Defendant stands charged in a superseding indictment with ten counts of wire fraud, ten counts of giving false statements, ten counts of making false claims, and ten counts of submitting false statements or reports to the Federal Crop Insurance Corporation. The government's charges are based on an alleged scheme to defraud arising from the defendant alleged misstatements of farmers' Actual Production Histories ("APH") in submitting applications and/or claims for crop insurance between 1998 and 2003.  Defendant has filed a motion to dismiss the superseding indictment, alleging the government's pre-indictment delay has violated his Fifth Amendment rights to due process of law.

   An evidentiary hearing was held before me on November 28, 2007 at which the court heard the parties' evidence and took the matter under advisement.  I now recommend that the motion be denied.


                      PARTIES' POSITIONS

   The defendant argues that the government's delay in bringing the matter to the grand jury for indictment was intentional and has

prejudiced his defense. Specifically, defendant claims that two of the alleged producers named in the indictment have become incapacitated since the investigation and another has very poor health, making his availability for trial unlikely. In addition, defendant sold his crop insurance agency in January, 2003 to a man who has since died.

The government counters that the charges have been brought within the limitations periods allowed by law; the delay was not an intentional or strategic tactic by the government; and the defendant has failed to show actual prejudice arising from any such delay.

## FACTS

Investigation into the facts leading to the indictment and superseding indictment sprang from a review begun in September, 2000 by the Risk Management Agency ("RMA") into claims made by farmers who were paid for not planting various acres of land, instead converting it to forage production. William K. Harris, a Compliance Investigator for RMA called the Farm Services Agency ("FSA") offices in the Loup City, Nebraska area to review claims. Eventually, Harris discovered what he considered to be extra high yield reports on various acreage plots that had been converted to forage production to qualify for the "preventive planting" benefits. In the spring of 2001 he began examining records from the 1997-2000 crop years to determine if the APH certified on claims matched the historic figures for the same fields.

As part of his examination, Harris wrote letters to all of the claimants of such benefits, asking for production records they were

required to keep, so as to verify the high-yield figures submitted for the benefits claimed. He found that "not a single one of them" had adequate records to verify the production amounts they had claimed. Some farmers had some documentation, but no one had sufficient documentation for all the acres they were insuring with the Federal Crop Insurance Corporation. Approximately 75 of these farmers had purchased their Multiple Peril Crop Insurance through the defendant's agency in Loup City, Nebraska.

Harris interviewed many of the farmers personally. The producers had various reasons for not having the production records, one of which was that the defendant had requested the farmer to sing a "blank" document, and stating that the defendant would thereafter complete the blanks with the "county average transitional yield" figures.[1] Harris also discovered that the number of acres claimed in the forage production program differed significantly in several cases from the number of acres claimed to be in the same fields for disaster relief programs in which the defendant had no involvement. Harris traced the discrepancies and discovered inflated yields, non-grown crops, and others.

The Office of Inspector General ("OIG") also started investigating the matter, and by 2002 enough problems had been discovered that some sort of civil sanctioning actions (fines, debarment, etc.) against the Wentworth Agency were being considered. OIG took over the investigation in 2002, although RMA (and Harris) continued to assist. The matter became a criminal

---

[1] This is a term used to refer to county-wide production yield figures for a crop. While using the "T-yield" figures was permitted in some programs, it was not allowed in this particular year because the forage production program was experimental, run only for 2001 and 2002 crop years, on one-year only agreements.

investigation in the summer of 2002, and was broadened to include "spring crops" (corn, beans, sunflowers, sorghum).

A warrant search of the defendant's agency's records was conducted in December, 2002. That search yielded 52 boxes of documents. OIG did not start examining these records until they had all been copied and the copies given to the defendant's representatives.

In January, 2003 the OIG investigator, Martin Dahlke, obtained records from Sherman County Bank. Records from the crop insurance companies were obtained in June, 2003, and additional records were received in September and October, 2003.

In March or April, 2003 RMA began interviewing the 150 largest producers'[2] records to compare claims made in crop insurance applications, yield production records, and disaster payments for crop years 2000-2003. RMA told the FSA offices in the area that "all these yields are suspect," and had them use, instead, their county's average yields. RMA began the process of visiting all FSA offices involved (offices in 38 counties in three states) to copy all relevant records, maps, certifications, and claims for crop years 1998-2002. The investigation also involved records of the FCIC and several insurance companies, one of which went into bankruptcy during the investigation period. It also involved several crops and several crop years, in some cases continuing to 2007. In addition, the producers' records were not forthcoming in

---

[2] Harris testified that while the investigation began with examination of 70-80 claims and 80-90 forage production insurance policies, eventually it reached approximately 400 "tax numbers" and a combined total of between 600-700 tax numbers, producers, claims, and policies.

4

a timely fashion, as the farmers apparently were not uniformly cooperative.

The investigation was complicated by the need to compare all FSA records for a particular field for a ten-year period, comparing even measurements of grain in storage, which according to Harris, was done differently by FSA and RMA.  When the figures did not match, additional investigation was required to determine why.

The information-gathering stage of the investigation was essentially halted in early 2005, when 58 farmers filed a civil lawsuit against the RMA and other defendants, including a claim that crop insurance companies were withholding payments on crop insurance claims for prior years.  During the period of the lawsuit, which was dismissed in May, 2006, RMA and OIG were instructed to halt their contact with any producer among the 58 plaintiffs, as well as anyone else in the "whole book of business."

The OIG investigation was conducted by one investigator, Martin Dahlke, from his office in Lincoln, Nebraska.  Dahlke had no support staff, but did get some assistance from other OIG staff in Kansas City, Missouri on some occasions.  Because Dahlke was the only OIG person in Nebraska, and because there were other cases developing contemporaneously with this case, his attention to this investigation was sometimes interrupted.  In 2004-2005, for example, Dahlke was involved in a food stamp fraud investigation being prosecuted by the Nebraska office of the United States Attorney.  He interviewed over 75 people in that case in preparation for its trial, which, after two prior settings, finally began in August, 2005.  He was also required to assist government counsel during the trial.

Dahlke's work was further delayed by the fact that checking all the records was a tedious undertaking. Each piece of paper involved often six to eight individual pieces of information to be checked against other records. Additionally, about thirty producers, at varying times, requested access to their own records that were part of the materials seized from the defendant's office in 2002; those requests were honored, and Dahlke testified that they "nearly always" involved going through multiple boxes of records to get all of them from just one producer.

Before the matter could be evaluated for criminal prosecution, Dahlke had to determine the actual APH for each producer's land involved in the investigation. As noted earlier, the producers themselves often had no or very few records, and it sometimes took Dahlke up to a week just to compute one APH, after all information had been received. Dahlke gave this information to the Center for Agribusiness Excellence at Tarleton State University in Texas.[3]

---

[3] The testimony referred to the "Center for Agricultural Excellence," but no such institution could be found; rather the "Center for Agribusiness Excellence" at Tarleton State University was founded in 2000 and describes itself in its web site as:

> . . . under the supervision of the U.S. Department of Agriculture's (USDA's) Risk Management Agency (RMA). The RMA helps the nation's farmers mitigate production risks through the Federal Crop Insurance Program. Tarleton has been joined by Planning Systems Incorporated in this first-of-a-kind academic-commercial cooperative effort. The Federal Crop Insurance Program gives 1.26 million farmers and ranchers in more than 3,000 counties $50 billion in protection for 114 crops on nearly 78% of the nation's insurable acres. Seventeen private insurance companies sell and service the policies.
>
> CAE's data warehouse contains all RMA policy information from 1991 to the present plus data on weather, soils, and other agronomically relevant

The Center's analysis of the production records was received in December, 2006.

The original indictment in this case was returned on December 13, 2006.

Tim Domgard, an investigator in the office of defendant's counsel, testified that he interviewed Donald Ference (identified as "DF" in Count 25 of the superseding indictment) on July 5, 2007. Domgard observed him during that interview to appear "quite confused," as there were long pauses between Domgard's questions and his answers.  Ference's son later told Domgard that his father had recently been diagnosed with Alzheimers Disease.  Domgard had no information about how confused he might have been at any earlier time.

William Harris, however, testified that he had interviewed Ference in March and April of 2003, attempting to get production records, an effort which apparently was unsuccessful.  Harris testified that Ference's application, prepared by defendant's agency, incorrectly utilized a production yield obtained from his fields in another county for the crop year 2000.

---

factors.  Using warehouse data, CAE's Spotcheck List program identifies multi-year patterns that signal anomalous crop insurance claims.  RMA compliance staff review these lists of potentially questionable claims, and the Farm Service Agency (FSA) notifies producers on the list that growing season inspections will be performed on their crops.  Producers usually react to this notice by avoiding any contemplated improper activities, thereby resulting in dramatic, visible decreases in claims and payments both in the crop year and the following years.

Another of the producers whose claims are a subject of the indictment, Marshall Claeys (identified as "MC" in Counts 4 and 14), was interviewed by Domgard on October 31, 2007. Domgard stated that Claeys told him that the figures provided in defendant's application and claim files for his crops were correct. Claeys died in November, 2007. Domgard had no other contact with him prior to the interview on October 31, 2007.

According to the testimony of Harris, however, Claeys had told him on January 7, 2002 that the yields reported on his crop insurance applications had been inflated and that he had never gotten such yields. Harris also testified that Claeys' information on his application conflicted with his FSA reports, and he was incorrectly given "new producer status" and claimed 100% of the "T-Yield" when it should have been computed at 65%.

The parties agree that defendant sold his business to Glen Johnson in 2003, and that Mr. Johnson died in 2005.

## APPLICATION OF LAW TO FACTS

The two issues before the court are whether defendant has been actually prejudiced as a result of government delay; and if so, whether the government intentionally delayed the conclusion of its investigation and the seeking of the indictment to obtain a tactical advantage over the defendant or to harass him. United States v. Marion, 404 U.S. 307, 324 (1971); United States v. Gladney, 474 F.3d 1027, 1030-31 (8th Cir. 2007); United States v. Bartlett, 794 F. 2d 1285, 1289-90 (8th Cir. 1986).

8

Defendant has failed to show that he was prejudiced by the passage of time.  Regarding the unavailability of witnesses, it appears from the testimony in the hearing that while Claeys and Ference may not be available to testify in the trial, their unavailability was not the intentional result of government delay.[4]  In addition, defendant produced no evidence to the effect that their testimony would have been available at any earlier time, nor to the effect that the same information is not available from other sources today.

To establish that the defendant has been so prejudiced by the government's delay that a Due Process violation has occurred, defendant has the burden of proof.

> The Fifth Amendment's Due Process Clause protects a criminal defendant against unreasonable pre-indictment delay. [United States v. Haskell, 468 F.3d 1064, 1070 (8th Cir. 2006)].  To prove a violation of his due process rights, [defendant] must establish the delay resulted in actual and substantial prejudice to the presentation of the defense and the government intentionally delayed [defendant's] indictment either to gain a tactical advantage or to harass him. Id.  The court will inquire into the reasons for delay only where actual prejudice has been established. United States v. Sturdy, 207 F.3d 448, 452 (8th Cir. 2000).  To establish actual prejudice, a defendant must identify witnesses or documents lost during the delay period. Id.  However, actual prejudice cannot be established by defendant's speculative or conclusory claims of possible prejudice as a result of the passage of time. Id.  The defendant carries the burden to show the lost testimony or information is not available through other means. Id.

---

[4]   It also appears the government's case against the defendant regarding the counts involving these two producers may be substantially record-driven.  It is difficult, based on the evidence before the court, to see how their testimony would be so helpful to the defendant that it would call into question written production records on applications and claims.

<u>United States v. Gladney</u>, 474 F.3d at 1030-31.  See also <u>United States v. Brockman</u>, 183 F.3d 891, 895 (8th Cir. 1999).  Defendant has failed to meet his burden of proof on the issue of prejudice.

Even had the defendant shown actual prejudice, the evidence is overwhelming that the government did not intentionally delay its investigation to obtain tactical advantage over the defendant and somehow reduce his ability to defend this case, nor to harass him. Defendant produced no evidence at the hearing that completion of any of the investigative steps in this case was delayed for any reasons other than producers' delays in providing records, the number and complexity of the records, and the severely limited government resources in reviewing and analyzing those records. There was no inordinate delay.

Accordingly,

IT THEREFORE HEREBY IS RECOMMENDED to the Hon. Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. §636(b)(1)(B) that the defendant's motion to dismiss, filing 31, be denied in all respects.

FURTHER, IT HEREBY IS ORDERED, Defendant is given ten days from the availability of the hearing transcript to counsel in which to file an objection to this recommendation.  The failure to object to this recommendation as provided in the local rules may result in a waiver of the right to appeal the district judge's adoption of findings in the recommendation.

Dated December 31, 2007

BY THE COURT

*s/ David L. Piester*
United States Magistrate Judge